# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 14-30423

_____

United States Court of Appeals
Fifth Circuit

**FILED**

March 31, 2015

Lyle W. Cayce
Clerk

JAMES JOHNSON,

Plaintiff – Appellant

v.

PPI TECHNOLOGY SERVICES, L.P.,

Defendant – Appellee

_____

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:11-CV-2773

_____

Before JOLLY and DENNIS, Circuit Judges, and RAMOS[*], District Judge.

PER CURIAM:[**]

On November 8, 2010, Appellant James Johnson (Johnson) was working as a drilling superintendent off the coast of Nigeria on an oil rig affixed to the HIGH ISLAND VII. According to Johnson, Nigerian gunmen boarded the rig using stairs that rig employees had left extended in violation

---

[*] District Judge of the Southern District of Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of security precautions. The gunmen shot Johnson in the leg, causing severe damage to his leg and requiring months of hospitalization, numerous surgeries, and a knee replacement, leaving him with limited mobility. On November 8, 2011, Johnson filed a complaint seeking remedies under the Jones Act, 46 U.S.C. § 30104, and general maritime law against various corporate entities, including PPI Technology Services, L.P. (PPI Tech).

At issue in this appeal is Johnson's claim that PPI Tech was his employer and owed duties in negligence to Johnson. The District Court Chief Judge, Sarah S. Vance, denied PPI Tech's motion to dismiss on the employer issue after converting it to a summary judgment motion and finding that there were disputed issues of material fact. After two years and extensive discovery, PPI Tech filed a second motion for summary judgment with additional evidence, reurging its argument that it was not Johnson's employer. Judge Carl Barbier, to whom the case had been reassigned, granted PPI Tech's motion.

Johnson appeals, raising three issues. He claims that the trial court erred in (1) reconsidering the employment relationship on a second summary judgment after the first such motion was denied; (2) finding as a matter of law that PPI Tech was not his employer; and (3) refusing to allow him to amend his complaint to join a new defendant as his employer. Because we find no error or abuse of discretion, we affirm.

## I.

### SUCCESSIVE SUMMARY JUDGMENT MOTIONS

Johnson contends that Judge Barbier should have treated Chief Judge Vance's prior holding—that material fact issues precluded summary judgment on PPI Tech's status as Johnson's employer—as a final one, permitting him to take the issue to the jury. PPI Tech responds that it was

appropriate to consider a second motion because the parties had, in the meantime, conducted extensive discovery with every opportunity to develop evidence that had not been submitted with the first motion.

We treat such matters as falling within a trial court's discretion to control its docket. *Enlow v. Tishomingo Cnty., Miss.*, 962 F.2d 501, 507 (5th Cir. 1992) (the timing and sequence of motions, including successive summary judgment motions, best lies at the district court's discretion). That discretion may be exercised whether or not new evidence is submitted with the subsequent motion. *Id.* at 506 (permitting successive motion on expanded record); *Hudson v. Cleco Corp.*, 539 F. App'x 616, 617-18 (5th Cir. 2013) (subsequent motion allowed, despite lack of new evidence).

The trial court's discretion to make these decisions regarding the manner in which the case proceeds is not limited by a prior judge's participation in the case. Thus, despite another judge's earlier decision, the matter may be reconsidered and decided differently. *Cannon v. Principal Health Care of La., Inc.*, 87 F.3d 1311, *1 (5th Cir. 1996) (per curiam) (unpublished) (refusing to apply the "law of the case" to bar reconsideration of a motion accompanied by new evidence when the first motion was denied by a different judge). We therefore hold that Judge Barbier acted within his discretion to consider PPI Tech's second motion for summary judgment despite the fact that Chief Judge Vance had already denied a summary judgment motion on the same issue.

## II.

## PPI TECH AS EMPLOYER

### A. Standard of Review

We review the granting of summary judgment de novo. *Cal-Dive Int'l, Inc. v. Seabright Ins. Co.*, 627 F.3d 110, 113 (5th Cir. 2010). Summary

judgment should be affirmed when the evidence, viewed in the light most favorable to the non-movant, shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Amburgey v. Corhart Refractories Corp.*, 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). Here, the operative facts are not in dispute, although their legal significance is contested.

**B. Facts**

Afren[1] was responsible for operating the drilling rig on the HIGH ISLAND VII. Afren contracted with PPI Technology Services Nigeria (PPIN) to provide drilling services on the rig, including furnishing skilled and professional workers. PPIN met its contractual obligations to Afren through a Consulting Services Agreement (CSA) with Petroleum Services Limited (PSL) and PPI Tech. According to the CSA, PPI Tech would provide a number of support services to PSL for use in PPIN's business and operations, including furnishing employees skilled in engineering support, project management support, quality assurance, materials and logistical support, and training.

In return, PPIN agreed to pay a monthly fee to PPI Tech, along with a fee equal to "actual employee cost" plus fifteen percent and reimbursement of expenses for personnel supplied to PSL for PPIN's operations. From those payments, PPI Tech transferred to PSL the amount to be paid to the employees. Further illustrating the relationship between PPIN, PSL, and PPI Tech, the CSA provided that PPIN and PSL would indemnify PPI Tech for all claims brought by PPIN's or PSL's employees for bodily injury or

---

[1] The record reflects that more than one corporate entity bearing the "Afren" name may have been involved in the drilling operations at issue in this case. The exact relationship of the various Afren companies is unclear. However, for purposes of this opinion, we need not distinguish them and thus use the name generically, as was done in the Johnson Agreement, described within.

property damage. They would also indemnify PPI Tech for all claims of patent infringement for the use of equipment, tools, and methods of operations. Contractually, PPI Tech acted in relevant part as an employment agency for PPIN and PSL, staffing PPIN's jobsite.

To fulfill its staffing obligations to PPIN and PSL, PPI Tech representative, John Arriaga, recruited Johnson to work on the drilling rig in Nigeria. Explaining that they run their "international guys" through a separate corporation, PPI Tech administrative assistant, Sandra Berkline, had Johnson sign a Consulting Agreement (Johnson Agreement) with PSL. Later, with PSL's consent, Johnson substituted his wholly-owned company, Global Oil Consulting, LLC (Global Oil), as the party contracting with PSL on his behalf. The Johnson Agreement describes the arrangement as follows:

> WHEREAS, [Johnson/Global Oil] is engaged in an independent business related to services to be performed on behalf of [PSL]; and
>
> WHEREAS, [PSL] is engaged in a third-party international onshore and offshore development project in West Africa ("Project") performing services for its customer ("Client"); and
>
> WHEREAS, the parties desire to enter into a service relationship to be governed by the terms and conditions set forth herein;
>
> NOW THEREFORE, in consideration of the mutual promises set forth herein, the sufficiency of which is hereby acknowledged, the parties agree as follows:
>
> 1. Services.
>
> Commencing on the Effective Date, [Johnson/ Global Oil] agrees to perform the usual and general services customary in the oil and gas industry of Well Site Supervisor on an international project team, on behalf of [PSL], and to perform work as directed from time to time by [PSL] and its Client. Your services

> have been contracted to Afren. You will get your instructions, duty charges, job responsibilities, etc. from Afren. You will be expected to adhere to Afren rules and regulations at all times during periods of compensation, i.e. from the time you board the plane to come to Nigeria until you disembark from the plane in your home country.

PSL agreed to pay Johnson a daily rate, reimburse out of pocket expenses, and provide medical coverage. According to the Johnson Agreement, the parties agreed that Johnson was an independent contractor and not a PSL employee and that he had sole control over the manner and means of performance under the Agreement.

A number of the facts to which Johnson testified are entirely consistent with viewing PPI Tech as an employment recruiter and administrator according to the respective terms of the CSA and Johnson Agreement. After Arriaga[2] recruited him for the PSL/Afren position, Birkline coordinated all administrative matters, such as his travel to and from Nigeria, and his insurance claims following the injury. PPI Tech handled the logistics of documenting Johnson's time and getting him paid through PSL. PPI Tech also supplied Johnson with a PPI Tech email account for his use while on the job in Nigeria. After Johnson's injury, Scott Kirklin, general counsel for PPI Tech, assured Johnson that the medical insurance procured by PSL would be required to pay for his treatment.

However, Johnson also testified that three apparent PPI Tech employees, Ron Thomas, Galan Williams, and Jack Rankin, interacted with and supervised him while on the rig on a daily basis. They used PPI Tech email accounts and had signature lines indicating that they were officers of

---

[2] Arriaga's email signature lists him as Project Coordinator, PPI Technology Services, with "713" area code phone numbers and a "ppitech.net" email address.

PPI Tech.  In particular, Thomas was represented to be an engineer, a co-founder of PPI Tech, and its President, working out of the Houston, Texas PPI Tech office.  Williams was represented as Vice-President for Contracts Administration for PPI Tech, working out of the Houston, Texas office.  And Rankin's email signature listed him as "Afren Energy Ebok Development Project PPI Technology Services."

PPI Tech does not dispute that Thomas, Williams, and Rankin supervised Johnson, but it claims that they did not do so in any PPI Tech capacity.  Instead, Thomas, a member of the PPIN Board of Directors, testified that he was a drilling advisor supplied by PPIN to Afren, and was paid by CIMA Management.  He also testified that Williams and Rankin were project managers supplied by PPIN to Afren, with duties governed by a contract between PPIN and Afren.  Williams testified that he was a consultant supplied by PSL to PPIN.  He charged PSL for his services, PSL charged PPIN, and PPIN charged Afren.  While these men held offices in PPI Tech, their supervision of Johnson was not related to the business of PPI Tech, which functioned as an employment agency with administrative duties, but was for PPIN and Afren, which functioned as drilling operators.

Ultimately, Johnson's duties, along with those of Thomas, Williams and Rankin, were controlled by a well plan belonging to Afren.  In that respect, PPIN had secured their services for Afren's project.  According to Kent Schwarz, the managing director for PPIN, PPI Tech had no presence or employees in Nigeria or on the HIGH ISLAND VII.  PPI Tech did not direct or control any of the drilling operations.  Johnson's position, generally referred to as "company man," was the highest ranking worker on the rig, representing Afren.

**C. Discussion**

The Jones Act confers upon a seaman the right to sue his employer for negligence resulting in personal injury. 46 U.S.C. § 30104. According to his contract, Johnson (through Global Oil) was employed by PSL to work for Afren. To sustain Johnson's argument that he was PPI Tech's employee despite his nominal, contractual relationships, he must be able to demonstrate that he was a borrowed servant of PPI Tech. "An injured worker may show that he was a borrowed servant at the time of his injury by establishing that the employer against whom recovery is sought 'had the power to control and direct the (servant) in the performance of (his) work.'" *Baker v. Raymond Int'l, Inc.,* 656 F.2d 173, 178 (5th Cir. 1981) (citing *Gaudet v. Exxon Corp.*, 562 F.2d 351, 355 (5th Cir. 1977)).

District courts decide the borrowed employee issue as a matter of law if sufficient factual issues are undisputed. *Capps v. N.L. Baroid-NL Indus., Inc.*, 784 F.2d 615, 617 (5th Cir. 1986). "We will not insist upon expense and delay of a trial if the overall issue can be resolved through a preponderance of other factual matters not in dispute." *Gaudet*, 562 F.2d at 358. The following nine factors, commonly referred to as the *Ruiz* factors, are used to determine when an employer has borrowed a servant:

1. Who has control over the employee and the work they are performing, beyond mere suggestion of details or cooperation?

2. Whose work is being performed?

3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

4. Did the employee acquiesce in the new work situation?

5. Did the original employer terminate his relationship with the employee?

6. Who furnished tools and place for performance?

7. Was the new employment over a considerable length of time?

8. Who had the right to discharge the employee?

9. Who had the obligation to pay the employee?

*Id.* at 355 (citing *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312-13 (5th Cir. 1969)). No single factor is determinative and we look to the "venture as a whole." *See Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 795 (1949).

The district court held that all but one of the *Ruiz* factors—the right to terminate the employment relationship (factor 8)—weighed against a finding that Johnson was PPI Tech's borrowed servant. Johnson only contests the district court's conclusions pertaining to three additional factors (factors 1, 2, and 3), discussed below. He argues that those four factors, together, dominate the determination under *Ruiz* and defeat PPI's requested summary judgment and, at least, entitle him to a jury determination of the issue.

Factor 1: Control. Thomas, Williams, and Rankin clearly controlled Johnson and his work. The question is whether they did so in their capacity as officers of PPI Tech or as consultants procured by PPIN to work for Afren. The Johnson Agreement provided that Johnson was employed by PSL to work for Afren. The supervision imposed by Thomas, Williams, and Rankin was related to Afren drilling operations. Afren had no relationship with PPI Tech and relied only on PPIN to supply professional manpower such as that offered by Johnson. All of these facts militate against a finding that PPI Tech was in control.

The only evidence to the contrary is Johnson's subjective belief that his supervisors were supervising on behalf of PPI Tech because they had some association with PPI Tech. Johnson's confusion, resulting from a complex business structure involving multiple corporate entities in international operations, is insufficient to create a fact issue for the jury to decide. *Baker*,

656 F.2d at 173 (reversing a jury finding in favor of the employee under substantially similar facts).

PPI Tech was not in the business of oil and gas drilling. Instead, it was in the business of recruiting employees and handling administrative tasks associated with those hires. Johnson was not employed to recruit others or to act as an administrative assistant. The district court found that the facts here do not support a finding that PPI Tech had control over Johnson and the work he was performing. We agree.

Factor 2: Whose Work. As already discussed, Johnson was performing Afren's work on the HIGH ISLAND VII, as Afren owned the rights to the minerals it sought to extract from the seabed and Johnson was the company man on the rig. The Johnson Agreement expressly provided that Johnson was hired to do work for Afren, subject to Afren's "instructions, duty charges, job responsibilities . . . rules and regulations." Johnson does not dispute this, but suggests that some portion of the overall mission was parceled out to PPI Tech, which he performed.

But PPI Tech was not given a portion of the drilling operation to perform. Instead, PPIN gave it the task of finding the people who could do Afren's work on Afren's terms. PPIN's Kent Schwarz testified clearly and definitively that PPI Tech had no business, presence, or employees on the rig. To find that Johnson was performing PPI Tech's work would require Johnson to be an employment agency administrator rather than a company man on a drilling rig. Consequently, we agree with the district court's determination that this factor weighs against a finding that Johnson was PPI Tech's employee.

Factor 3: Meeting of the Minds. The question is whether there was an agreement, understanding, or meeting of the minds between the original or

nominal employer and the borrowing employer as to the status of the employee. Johnson's argument focuses on PPIN's relationship with PPI Tech. That relationship, defined by the CSA and including PSL, established a meeting of the minds that PPI Tech would recruit workers for PPIN to furnish to Afren. Nothing about the arrangements between them indicated an agreement that Johnson would work for PPI Tech rather than for PPIN, Afren, or PSL. Johnson's argument is unsupported by evidence and we agree with the district court that this factor weighs against a finding that Johnson was PPI Tech's employee.

Factor 8: Right to Discharge. The district court found only one factor, the right to discharge, slightly favored Johnson's claim. PPI Tech disputes this finding as inconsistent with the evidence showing that any decision regarding Johnson's supervision would be made pursuant to the powers retained by PPIN and Afren over the drilling operations. The district court acknowledged this aspect of control, but viewed the evidence in favor of Johnson as the non-movant in the summary judgment procedure.

The district court credited testimony that Randy Sullivan, the Chief Executive Officer of PPI Tech, as well as a PPI Tech Country Manager, had the power to discharge Johnson. Additionally, the district court noted that, as a practical matter, any directive to discharge Johnson coming from PPIN or Afren would likely have to be administered through PPI Tech employees. We decline to disturb the district court's finding on this factor. We further concur with the district court's assessment that the factor has only slight weight when balancing the issues governing the determination of a borrowing employer.

Totality of the Circumstances. Johnson did not contest the district court's findings as to the remaining five *Ruiz* factors. The trial court held

that those factors supported a conclusion that PPI Tech was not Johnson's borrowing employer and we agree: (1) Johnson acquiesced in working for PSL, PPIN, and Afren, although it likely went unnoticed that he was not working for PPI Tech due to the complexity of the business structure; (2) PSL did not terminate its relationship with Johnson during the employment arrangement; (3) PPI Tech did not furnish tools and a place for performance and was contractually absolved of responsibility therefor; (4) there was no "new employment" to consider; and (5) PSL had the continuing obligation to pay Johnson through Global Oil.

In reviewing the evidence as a whole, and considering this Court's holding in *Baker* and the nine *Ruiz* factors, we hold that PPI Tech was not Johnson's borrowing employer as a matter of law. Johnson's subjective belief and his supervisors' nominal positions with PPI Tech are insufficient to show that genuine disputes exist over enough determinative facts to preclude summary judgment.

## III.

## MOTION FOR LEAVE TO AMEND

In response to PPI Tech's summary judgment motion, Johnson sought leave to amend his complaint in order to name PPIN as a defendant. Johnson argues that the district court abused its discretion because Rule 15 provides for the "liberal amendment" of pleadings. While the district court did not squarely address Johnson's request, the entry of the district court's order dismissing Johnson's claims should be construed as an implicit denial of any outstanding motion for leave to amend. *Stokes v. Dolgencorp, Inc.*, 367 F. App'x 545, 549 (5th Cir. 2010) (citing *Tollett v. City of Kemah*, 285 F.3d 357, 369 n.* (5th Cir. 2002)).

A district court's determination of whether to allow a party to amend his pleadings is ordinarily reviewed under the abuse of discretion standard. *Wilson v. Bruks-Klockner, Inc.*, 602 F.3d 363, 368 (5th Cir. 2010).  Pursuant to Fed. R. Civ. P. 15(a), leave to amend "shall be freely given when justice so requires."  Leave to amend may be denied for undue delay, bad faith, or dilatory motive and when the amendment would be futile—for instance when the amended claim would not survive a Fed. R. Civ. P. 12(b)(6) review. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Stripling v. Jordan Prod. Co., LLC*, 234 F.3d 863, 872-73 (5th Cir. 2000).  When leave to amend is refused on the sole basis that the amendment would be futile, review is de novo.  *Wilson,* 602 F.3d at 368.

We find that Johnson has not demonstrated that the district court abused its discretion.  The district court's May 24, 2013 scheduling order was entered over 18 months into the litigation and over 6 months prior to Johnson's motion.  It prohibited any additional amendments to pleadings.  It was within the district court's discretion to control its docket in this way.  So while Johnson complains that the case was not set for trial at the time of his request, that argument disregards the additional delay attendant to joining a new party and protecting that new party's due process rights in the litigation. *See generally*, *Acevedo v. Allsup's Convenience Stores, Inc.*, 600 F.3d 516, 521 (5th Cir. 2010) (district courts have the discretion to refuse joinder in the interest of avoiding prejudice and delay, ensuring judicial economy, or safeguarding principles of fundamental fairness).  Johnson's remaining arguments regarding delay and prejudice reveal only a failed trial strategy that does not define the limits of discretionary docket management.

Additionally, PPI Tech argues that any amendment would have been futile as a matter of law and it thus would have been an abuse of discretion to

grant the request.  In particular, PPI Tech recites, and Johnson does not dispute, that a three-year statute of limitations period applies.  Johnson, however, argues that his claim against PPIN would have related back to the original filing of this case against PPI Tech.  "Although the district court did not address futility in its order, we may affirm for any reason supported by the record, even if not relied on by the district court."  *United States v. Gonzalez*, 592 F.3d 675, 681 (5th Cir. 2009) (citing *LLEH, Inc. v. Wichita Cnty., Tex.*, 289 F.3d 358, 364 (5th Cir. 2002)).  This Court reviews the futility argument de novo.

Whether an amended complaint relates back to an original complaint against a new defendant for statute of limitation purposes is governed by Fed. R. Civ. P. 15(c), which has been described as requiring the moving party to satisfy the following elements:

> (1) [The claim] must arise from the same transaction or occurrence as the original pleading . . . and (2) . . . the party named in the amended pleading must have both received sufficient notice of the pendency of the action so as not to be prejudiced in preparing a defense, and have known or should have known that but for a mistake of identity the party would have been named in the original pleading.

*Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010) (citation omitted).

Johnson's claims against PPIN clearly arose out of the incident set forth in the original complaint.  But he did not demonstrate that his failure to sue PPIN was a matter of mistake.

> The classic example of mistake is misnomer; that is, when a plaintiff misnames or misidentifies a party in its pleadings but correctly serves that party.  In these cases, relation back is appropriate because the defendant is already before the court . . . .  In some cases a legal mistake can lead to misnomer, as when

14

> a plaintiff names an institutional defendant because of confusion as to whether an individual or an institutional defendant is the proper party, but the individual is properly served and, therefore, has notice of the mistake. In contrast, *a conscious choice to sue one party and not another does not constitute a mistake* and is not a basis for relation back.

*Id.* (emphasis added and citation omitted). Johnson has not claimed any mistake on his part concerning the identity of the proper party. Instead, his arguments acknowledge that he had timely access to the identities of all entities involved in the drilling venture and even included them in his discovery efforts. Because Johnson has not demonstrated mistake, the Court need not consider whether PPIN knew or should have known that, but for the mistake, the litigation would have been filed against it.

The district court did not err in failing or refusing to permit Johnson to amend his pleading to assert his claims against PPIN.

## CONCLUSION

The district court's summary judgment is in all respects therefore,

AFFIRMED.